# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **MICHAEL LEACOCK,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civ. No. DLB-22-1306** |
| **IONQ, INC.,** *et al.*, | * | |
| **Defendants.** | * | |

## MEMORANDUM OPINION

Michael Leacock, on behalf of himself and others similarly situated (collectively, "the plaintiffs"), filed this securities class action against IonQ, Inc. ("IonQ"), two IonQ officers (collectively, "the IonQ defendants"), dMY Technology Group, Inc. III ("dMY"), and five dMY officers (collectively, "the dMY defendants," and collectively with the IonQ defendants, "the defendants"). IonQ develops, manufactures, and operates quantum computing hardware and software. dMY was a special purpose acquisition company founded for the purpose of effecting a merger with a technology-sector business; its merger with IonQ closed on September 30, 2021. Leacock, on behalf of shareholders who acquired IonQ stock between March 7, 2021 and May 2, 2022 (the "Class Period"), asserted violations of sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78n(a), & 78t(a) (2018) ("the Exchange Act"), and two regulations promulgated thereunder, 17 C.F.R. §§ 240.10b-5 (2022) ("Rule 10b-5") & 240.14a-9(a) ("Rule 14a-9"). ECF 64. Generally, the plaintiffs alleged the defendants defrauded them by misrepresenting what IonQ's quantum computers could do and where its revenue came from in order to artificially inflate IonQ's share price until the shareholders voted to approve the merger and the defendants could sell their shares. The plaintiffs contended that the post-merger

disclosure of the alleged misrepresentations by a short-seller report and the defendants' response to the report caused the price of IonQ stock to drop sharply, resulting in shareholder losses.

The IonQ defendants and the dMY defendants each moved to dismiss the amended complaint under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). ECF 75, 75-1, 77, 77-1. On September 28, 2023, the Court granted the motions, dismissed the claims with prejudice, and closed the case. ECF 97 (memorandum opinion), 100 (amended order).

On October 26, 2023, the plaintiffs moved under Rule 59(e) for reconsideration and under Rule 15(a) for leave to file an amended complaint. ECF 101. The motion is fully briefed. ECF 101-1, 105, 106, 107, 108, 109. No hearing is necessary. *See* Loc. R. 105.6. For the following reasons, granting leave to amend would be futile, so the motion for reconsideration and leave to file an amended complaint is denied.

## I.    Background[1]

### A.  Quantum computing

Quantum computing is an emerging and highly complex technology based on quantum mechanics, a subset of physics that operates at the atomic level. Quantum computers are fundamentally different from "classical" computers used today in that they "use the laws of quantum mechanics . . . to represent units of information, and those units of information interact with specially designed hardware and software to solve complex problems." ECF 101-4, ¶ 43. A quantum computer processes information using qubits, which (unlike a classical bit) can exist in a "superposition" of 0, 1, and any value in between. *Id.* ¶ 44. Qubits also can exist in a state of

---

[1] This background section draws from the proposed second amended complaint, ECF 101-4, and documents incorporated into the complaint by reference or judicially noticed, *see* ECF 97, at 17–22.

"entanglement," in which one qubit instantly can share its information with another "entangled" qubit, thus exponentially accelerating computing performance far beyond classical computing capacity. *Id.* ¶ 45.

There are numerous approaches to quantum computing. One is the "trapped ion" approach, in which a quantum computer traps ions "in free space using electromagnetic fields, and qubits are stored in the electronic states of each ion. Quantum information is then transferred through the qubits in each ion." *Id.* ¶ 46. The functionality of a trapped ion system is determined not by the number of qubits suspended in ions in the ion trap, but rather by the number of qubits that are entangled with each other in "gates." *Id.* ¶¶ 46–48. Other performance metrics also indicate whether a system is useful, including "'gate fidelity' (a measure of reliability of the gate operation), 'gate speed' (the speed of the operation), 'coherence time' (how long a qubit remains in its state of quantumness) and 'error rate' (how reliable the qubit is)." *Id.* ¶ 48. To function effectively, a quantum computer must have 99.98% or 99.99% fidelity.  It also must have effective and efficient error correction. The quantum computing industry has not yet delivered a system that reaches "fault tolerant quantum computing"—a quantum computer able to deliver "reliable and consistent performance to run complex problems successfully." *Id.* ¶ 52.

### B.  IonQ

IonQ is a quantum computing company that develops quantum computers using the "trapped ion" approach. *Id.* ¶¶ 64, 71. In its pre-merger form (which the complaint refers to as "Legacy IonQ"), it was founded in 2015 by two researchers and academics, Chris Monroe and Jungsang Kim. *Id.* The company is led by defendant Peter Chapman, who has served as its president, chief executive officer, and member of the board of directors since May 2019. *Id.* ¶ 26.

Defendant Thomas Kramer has served as IonQ's chief financial officer since February 2021 and as its secretary from late September 2021 until March 2022. *Id.* ¶ 28.

IonQ leases its corporate headquarters and its research and development and manufacturing facilities from the University of Maryland ("UMD"). *Id.* ¶ 65. In 2016, Legacy IonQ entered into a License Agreement with UMD and Duke University that allowed it to use work performed by Monroe and Kim at these universities to attempt to commercialize ion trap quantum computing systems. *Id.* ¶ 66. In return, the universities received shares of common stock in the company.[2] *Id.*

In 2019, Legacy IonQ began allowing customers to pay for access to its 11-qubit quantum computer through a cloud platform. *Id.* ¶ 70. In October 2020, Chapman posted an article to Legacy IonQ's website announcing that its new quantum computing system "smashe[d] all previous records with ***32 perfect qubits with gate errors low enough to feature a quantum volume of at least 4,000,000***." *Id.* ¶ 71.[3] A press release issued that same day quoted Chapman as saying that "[i]n a single generation of hardware, ***we went from 11 to 32 qubits***, and more importantly, ***improved the fidelity required to use all 32 qubits***." *Id.* ¶ 73. The announcements also indicated that the 32-qubit system would first be available to customers via private beta before being commercially available via the cloud. *Id.* ¶ 74.

### C. dMY

dMY was a special purpose acquisition company ("SPAC") founded by defendants Niccolo De Masi and Harry L. You for the purpose of effecting a merger with a technology-sector business. *Id.* ¶ 2. A SPAC is a company incorporated to go public in an Initial Public Offering ("IPO"), to

---

[2] These shares later converted into shares of IonQ when the merger with dMY closed.

[3] Bold and italicized emphases in quotes are in the proposed second amended complaint, unless otherwise noted.

find a private company to merge with, and to effectively bring that private company public without it having to undergo the IPO process. *Id.* ¶ 53. When a SPAC first is incorporated, a small group of initial investors, known as "founders," own a portion of its securities, called "founders' shares." *Id.* ¶ 54. The SPAC then sells a much larger portion of its securities to outside investors during the IPO. *Id.* The SPAC must consummate a merger within two years or else it dissolves and the IPO investors' funds are returned. *Id.* ¶ 55. Once a SPAC identifies a private company to merge with, it presents the proposed merger to stockholders for approval. *Id.* If the stockholders approve the merger, the founders must wait until a one-year "lock-up period" expires before they may sell founders' shares. *Id.* ¶ 56.

On September 14, 2020, dMY's sponsor—a limited liability company ("LLC") that was managed by You and of which De Masi was a member—subscribed for 7,187,500 founders' shares for a total price of $25,000. *Id.* ¶ 58. The next month, the sponsor transferred 25,000 founders' shares each to defendants Darla Anderson, Francesca Luthi, and Charles E. Wert. *Id.* Anderson, Luthi, and Wert served as directors of dMY from November 2020 until the eventual merger. *Id.* ¶¶ 32–34.

dMY went public in an IPO on November 17, generating gross proceeds for the SPAC of $300 million. *Id.* ¶ 59. When the IPO closed, dMY sold 4 million warrants—rights to purchase additional stock in the future for a fixed price—to the sponsor LLC; the warrants could be exercised only if dMY successfully merged with another company. *Id.* After the IPO closed, the sponsor LLC owned 7.5 million founders' shares, representing 20% of the 37.5 million outstanding shares. *Id.*

### D. The merger

Beginning in November 2020, dMY conducted extensive due diligence on Legacy IonQ to determine whether to take it public. *Id.* ¶ 60, 78. On November 13, 2020, De Masi reached out to Chapman to enter into a confidentiality agreement to discuss Legacy IonQ's business. *Id.* ¶ 78. The confidentiality agreement was signed on November 16. *Id.* ¶ 79.

On March 7, 2021, dMY and Legacy IonQ entered into a merger agreement. *Id.* ¶ 83. The next day, before the markets opened, they announced the merger. *Id.* The announcement detailed that Legacy IonQ would merge with a wholly owned subsidiary of dMY, Ion Trap Acquisition Inc. *Id.* ¶ 61. The surviving entity would continue as a subsidiary of dMY, renamed IonQ. *Id.* The announcement also stated that if the merger successfully closed, IonQ would receive $350 million from various investors who had agreed to purchase 35 million shares of IonQ as part of a private investment in public equity. *Id.* ¶ 62. dMY filed a registration statement for the merger with the SEC on March 30, 2021.[4] *Id.* ¶ 63. It later filed a proxy statement (the "Proxy") with the SEC on August 12, 2021. *Id.* ¶ 23.

Beginning on March 8, the defendants promoted IonQ and its 32-qubit computing system across various fora including public earnings calls, press releases, and presentations to analysts and shareholders. *See, e.g.*, *id.* ¶¶ 169, 177. Over the next six months, these promotional statements touted IonQ's 32-qubit system and its expected quantum volume; IonQ's progress in miniaturizing its quantum computing systems; and the error fidelity and error correction capabilities of IonQ's quantum computing systems (particularly the 11-qubit system). *Id.* ¶¶ 86–91. Analysts responded favorably to the defendants' statements, raising the price target of dMY's securities. *Id.* ¶ 92. On June 30, for instance, an analyst released a report with a "buy recommendation" and a $20 price

---

[4] The registration statement was amended three times, on June 17, July 16, and August 4, 2021.

target. *Id.* ¶ 92. Starting on September 9—as the merger vote drew nearer—the defendants also promoted IonQ's tripled contract bookings, a revenue metric that reflects what customers have agreed to pay for future access to the company's services. *Id.* ¶ 146.

On September 28, 2021, an overwhelming majority of eligible dMY shareholders voted to approve the merger. *Id.* ¶ 160. IonQ began trading publicly on October 1. *Id.* ¶ 163. Its Class A common stock reached a Class Period high of over $31 per share on November 16, 2021. *Id.*

### E.  The Scorpion Report and its aftermath

On May 3, 2022, the research firm Scorpion Capital ("Scorpion") issued a report (the "Scorpion Report") purporting to reveal that IonQ's claims about its quantum computing systems—in particular, its 32-qubit system—were false. *Id.* ¶ 98. The Report stated that Scorpion had conducted 25 anonymous research interviews, including with seven former IonQ employees and executives, 11 quantum computing experts, and five IonQ customers and partners. ECF 75-31, at 4. The former employees told Scorpion that the 32-qubit system "***was totally made up***," "***doesn't exist***," and IonQ is "***trying to cover up that it's not there***." ECF 101-4, at ¶ 98. The former employees also stated that IonQ's quantum computing systems were "massive 'elephant'-sized 'skunkworks' that [were] nowhere near miniaturization" and that the systems featured a fidelity of 70%. *Id.* ¶ 13. Scorpion claimed it hired experts to access the 11-qubit computer system independently and the experts found that the system returned the correct answer to "1 + 1" only 59% to 70% of the time. *Id.* ¶ 134. In addition, the Report emphasized that 70% of IonQ's 2021 Q3 revenue was funded by UMD and Duke and stressed that IonQ's announcement of a tripling

in its contract bookings a mere three weeks before the merger closed was, in fact, due to an investment from UMD. *Id.* ¶ 157.

The Scorpion Report also included certain disclaimers. It stated that Scorpion "cannot and does not provide any representations or warranties with respect to the accuracy" of its source materials. ECF 75-31, at 3. It noted that its quotes from experts omit "certain positive comments and experiences with respect to IonQ" and that the information provided by former IonQ employees "may be outdated." *Id.* It also stated that Scorpion is short IonQ—that is, it had staked a financial position on the prospect that IonQ's share price would fall—"and therefore stands to realize significant gains in the event that" the price of IonQ's securities declines. *Id.*

The day before the Scorpion Report was released, on May 2, IonQ's share price had closed at $7.86. ECF 101-4, ¶ 14. After the Report was released, on May 3, it closed at $7.15, falling 9.03%. *Id.* On May 4, the defendants issued a press release in response to the report. *Id.* On May 5, IonQ's shares fell to $6.23 (down 16.9%). *Id.* By May 11, the shares fell to $4.34, down 44.8% from the pre-Scorpion Report price. *Id.* IonQ issued another press release on May 12 criticizing the Scorpion Report. *Id.* ¶ 16.

### F.  Section 14(a) claim allegations

The plaintiffs allege that the defendants made misleading statements in the Proxy and related materials, failing to disclose to investors that (1) IonQ did not have a 32-qubit system and (2) its systems' error correction capabilities were worse than described.[5] These misleading statements and omissions, in the plaintiffs' view, artificially drove up IonQ's stock price and

---

[5] Proxy materials "are documents provided to investors that help them make informed decisions about their votes." *San Antonio Fire & Police Pension Fund v. Syneos Health, Inc.*, 75 F.4th 232, 238 n.2 (4th Cir. 2023) (citing 17 C.F.R. § 240.14a-3). The plaintiffs challenge these statements in the Proxy and related materials under both Sections 10(b) and 14(a).

misled shareholders, who relied on the Proxy when deciding to invest in IonQ and to approve the merger, only to see IonQ's share price plummet when the Scorpion Report was released. The plaintiffs contend that "[h]ad the Proxy accurately and truthfully described IonQ's quantum computing capabilities, that information would have materially affected" investors' votes. *Id.* ¶ 291.

The plaintiffs allege that statements in the Proxy about the 32-qubit system were false or materially misleading:

> The Proxy stated that "***IonQ's 32-qubit system, which is an important milestone for IonQ's technical roadmap and commercialization,*** is not yet available ***for customers*** and may never be available." These filings further advised that "***IonQ is developing its next-generation 32-qubit quantum computer system***, which has not yet been made available to customers."

*Id.* ¶ 283. The plaintiffs allege that these statements were misleading because they communicated to investors that IonQ "had an existing 32 qubit quantum computing system," when in fact it did not. *Id.* ¶ 284.

The plaintiffs also allege that Proxy statements on the system's error correction were misleading:

> The Proxy represented to investors that "For solid-state architectures, IonQ estimates that ***it may take at least 1,000 physical qubits to form a single error-corrected qubit, while for near-term applications with ion traps the ratio is closer to 16:1.***" In addition, the Proxy further represented that (i) "Because the ion qubits feature very low idle and native error rates and are highly connected, ***IonQ expects the error-correction overhead to be about 16:1 to achieve the first useful quantum applications. This contrasts with other approaches, for which IonQ estimates the overhead to be in the range of 1,000:1 to 100,000:1.***"; and (ii) "Compared to the trapped ion approach, the qubits generated via superconducting suffer from short coherence times, high error rates, limited connectivity, ***and higher estimated error-correction overhead (ranging from 1,000:1 to 100,000:1 to realize the error-corrected qubits from physical qubits).***"

*Id.* ¶ 285. These comparisons were misleading, the plaintiffs contend, because the defendants' estimate of a 16:1 error ratio was based on IonQ's current technology, whereas their estimates of

1,000:1 or 100,000:1 for IonQ's competitors' error ratios were based on competitors' earlier-phase, more rudimentary systems. *Id.* ¶ 286. Had the defendants compared IonQ's systems to its competitors' more recent machines, "the differences in error correction would be substantially narrower." *Id.* The plaintiffs allege that the Scorpion Report's revelation of the misleading nature of these statements and the defendants' failure to dispute the Report caused IonQ's share price to plummet, causing their losses.

### G.  Section 10(b) claim allegations

The plaintiffs also allege that throughout the Class Period, the defendants were aware a 32-qubit quantum computing system did not exist and IonQ's systems were nowhere near achieving the miniaturization or error correction necessary to achieve viability; that the defendants did not disclose these known problems to the public; and that the public statements that the defendants did make (both in the Proxy and elsewhere) were false and misleading. They further allege that in the three weeks leading up to the merger vote, the defendants made statements that attributed a tripling in contract bookings from $5 to $15 million to new cloud-based customers, rather than to a deal struck with UMD, a related third-party. Each of these types of misstatements, they contend, misled investors into "approv[ing] the [merger] and [propping] up the price of IonQ's securities after the closing." *Id.* ¶ 4.

### 1.  Material misrepresentations and omissions

### a.  Existence of 32-qubit computer

The plaintiffs allege that beginning with a Roadshow Presentation to investors on March 8, 2021, IonQ made statements representing that it had a 32-qubit quantum computing system with an expected quantum volume of over 4 million even though "Defendants knew, but did not disclose, that IonQ did not have a 32 qubit quantum computing system, let alone a system with

over 4 million quantum volume." *Id.* ¶ 165. The Roadshow Presentation announced a "32 qubit quantum computer with an expected quantum volume of 4,194,304, smashing the record for most powerful quantum computer." *Id.* ¶ 171. Chapman told investors that "***IonQ is easily winning***" compared to competitors using quantum volume as a benchmark. *Id.* ¶ 173.  The presentation slides contained a graphic titled, "IonQ leads the pack: potential quantum volume by vendor." *Id.* ¶ 172. The slides also stated that IonQ's quantum computer has the "***most usable qubits***" and the "***highest quantum volume by many orders of magnitude***." *Id.* ¶ 175. In an announcement video released that same day, the narrator stated that IonQ had "in October 2020, the world's most powerful quantum computer: ***a 32-qubit system that is a staggering 32,000 times more powerful than its closest competitors.***" *Id.* ¶ 177. The next day, on March 9, an interviewer asked De Masi about claims that IonQ's system was 32,000 times more powerful; De Masi assured investors, "***this is the 32 cubit system we're looking at here.***" *Id.* ¶ 178. The plaintiffs allege that the defendants made similar statements touting IonQ's 32-qubit system throughout the Class Period, not only in the Proxy but also in video presentations, earning calls, presentations to analysts, blog posts, and elsewhere. They contend that these statements were false or misleading because the 32-qubit system did not exist.

### b.  Miniaturization

The plaintiffs next allege that the defendants made materially false or misleading statements regarding their progress in miniaturizing quantum computing systems. During the Roadshow Presentation, De Masi stated that "***IonQ's technology is uniquely easy to manufacture***" and that IonQ's miniaturization advantages gave it a "***tremendous lead over other quantum players***." *Id.* ¶ 116. Chapman reiterated that "[f]or quantum to win, the systems need to shrink, and the cost per qubit must shrink as well, and IonQ is well-poised to win this phase too."

*Id*. ¶ 118. Slide 24 of the presentation was titled, "***IonQ's Leading Modular Architecture: Each Generation of IonQ is Getting Smaller & Cheaper to Build***." *Id*. ¶ 117. It depicted the size of IBM's and Google's purported quantum hardware, at six feet and 20 feet respectively, next to an IonQ ion trap labeled as two inches wide. *Id.* A later slide also displayed a "series of quantum computing systems of decreasing size," under the title, "Smaller Every Generation: Complete System." *Id*. ¶ 119. Under "2023," the slide included a picture of a sleek black box. *Id*. Chapman stated that "our goal is, by 2023, ***to build a relatively low-cost rack mounted, room temperature system***." *Id*. ¶ 120. Six months later, during an IPO Edge Chat on September 14, 2021,[6] De Masi again emphasized how the size of IonQ hardware compared to competitors', stating that

> we know how to shrink these things down to the point where we can put them in racks. So, it is a bit of a wives tale [sic] that says that ion traps have a problem at scaling. *When in fact, **actually the competition, with these huge devices are looking at building quantum computers that will be the size of a building or a football field . . . today [ion traps are] down to the size of about a half dollar***.

*Id*. ¶ 122. These statements were misleading, the plaintiffs allege, because IonQ was nowhere near achieving miniaturization.

### c.   Error correction and fidelity

The plaintiffs also challenge the defendants' statements about IonQ technology's error correction capabilities and the fidelity of its 11-qubit quantum computing system. Regarding error correction, the plaintiffs challenge the same Proxy statements described earlier. They also point to similar statements in the Roadshow Presentation, depicting IonQ's error correction as 16:1 and others' as 1000:1 or 1,000,000:1. Regarding fidelity, they allege that IonQ's website depicted the

---

[6] The plaintiffs allege that the IPO Edge Chat took place on September 15, 2021. *Id.* However, according to the transcript of the call filed with the SEC, of which the Court takes judicial notice, that is incorrect: the call took place on September 14 and the transcript was filed on September 15. ECF 75-52, at 2.

11-qubit system's average fidelity as >98% to >99%. They allege that the system's fidelity was in fact much lower and that the defendants omitted that even a system with a fidelity rate of 98–99% was effectively not functional.

### d. Contract bookings

Finally, the plaintiffs claim that roughly three weeks before the merger vote, the defendants made various statements that IonQ had tripled its contract bookings from $5 million to $15 million while misleadingly omitting that the increase was almost entirely attributable to an agreement with UMD, not to new customers seeking access to IonQ's cloud-based offerings. They point to remarks the defendants made in their announcement of the deal with UMD on September 8, their announcement on September 9 that they had tripled bookings expectations, a September 13 presentation to investors filed with the SEC, and calls with investors on September 14 and September 20. For instance, the plaintiffs allege that during the September 14 IPO Edge Chat, Kramer said that IonQ had announced in late March that "*we are anticipating $5 million in economic value generated from contracts in cloud* for this year 2021. And only last week, we announced that *we will raise this guidance target to three times [] five. And we now anticipate coming in at $15 million by year end*." *Id.* ¶ 151. The plaintiffs also allege that the defendants continued to make similar statements after investors voted to approve the merger. For instance, on November 15, Kramer attributed the tripled bookings expectations to "the promise our *customers* see in our platform, and resulted from *customers* buying more and also earlier than we had expected." *Id.* ¶ 154.

### 2. Scienter

The plaintiffs allege that the defendants knew or recklessly disregarded that the 32-qubit system did not exist; that miniaturization was not within reach; that their technology's error

correction and fidelity rates were not as good as described; and that UMD—not cloud-based customers—provided the money that tripled contract bookings. They likewise knew or recklessly disregarded that, as a result, their statements to the contrary and associated omissions would mislead investors. For support, the plaintiffs cite the Scorpion Report's interviews with ex-employees and to the allegations of a confidential witness ("CW1"). They claim one ex-employee had a conversation with Chapman in which he effectively conceded that the 32-qubit computer did not exist. CW1 claims he knew that Chapman had "no roadmap" to miniaturization and that he had raised the non-existence of a 32-qubit system with Chapman multiple times. *Id.* ¶ 241. The plaintiffs also allege the defendants were financially motivated to commit fraud because they wanted investors to approve the merger and then to maintain IonQ's high share price during a lock-up period, until they could sell their shares. They also assert that the defendants' high-ranking positions within IonQ and dMY—combined with the fact that quantum computing development is IonQ's core business—support the inference that the defendants knew or recklessly disregarded that they were making misleading statements. And for the dMY defendants in particular, they allege that their extensive due diligence and De Masi's physics background indicate that they must have known the alleged misstatements were false or misleading. The plaintiffs' scienter allegations concerning the contract bookings focus on the defendants' statements themselves. In particular, the plaintiffs emphasize the defendants' consistent pre-merger pattern of describing the UMD deal without identifying it as the source of the contract bookings and suggesting that the contract bookings increase was driven by an increase in cloud-based business users, rather than attributing it to the UMD deal.

### 3.  Loss causation

The plaintiffs claim that when the Scorpion Report was published before the market opened on May 3, 2022, it revealed to the public that IonQ's 32-qubit computer did not exist; the company was nowhere near achieving miniaturization; its error correction and fidelity rates were worse than stated; and its tripled contract bookings resulted from UMD's funding. They allege that the publication of the Report's disclosures caused the value of IonQ's stock to drop by 9.03% that day, falling from $7.76 per share to $7.15 per share. They further allege that because the defendants failed to deny any of the Report's specific claims, the value dropped further, reaching $4.43 per share on May 11. In support of these allegations, they identify four articles that implicitly or explicitly attributed the drop in IonQ's share price to the Scorpion Report. *Id.* ¶¶ 234–37.

### H.  The Court's prior opinion

On September 28, 2023, the Court granted the defendants' motions to dismiss. ECF 97 & 100. First, the Court found that the plaintiffs had not plausibly alleged that the Scorpion Report and CW1 were reliable sources of information the Court could consider on a motion to dismiss. With those sources off the table, the plaintiffs failed to plead the elements of a Section 14(a), Section 10(b), or Section 20(a) claim.

Second, the Court held that, even if the plaintiffs had plausibly alleged that the Scorpion Report and CW1 were reliable, the plaintiffs had failed to state a claim under Section 14(a), Section 10(b), or Section 20(a) anyway. The plaintiffs failed to state a claim under Section 14(a) because for each statement they challenged, they failed to plausibly allege falsity, loss causation, or both. With respect to loss causation, the fundamental problem was that it was implausible that investors believed that the truth about IonQ was revealed by an anonymously sourced short-seller report that disclaimed its own accuracy. In addition, there was no legal authority for the proposition that

IonQ's failure to squarely deny all of the Scorpion Report's allegations could count as a corrective disclosure.

The plaintiffs failed to state a claim under Section 10(b) because for each alleged falsehood, they failed to plausibly allege scienter, loss causation, or both. Specifically, the plaintiffs failed to allege scienter with respect to any of the alleged falsehoods except the pre-merger contract bookings claims. They failed to allege loss causation for any of the apparent revelations for the same reasons they failed to allege loss causation under Section 14(a). And they failed to allege loss causation with respect to the pre-merger contract bookings claims for the additional reason that they failed to allege the Scorpion Report revealed any new information about the source of IonQ's increased contract bookings. In light of those findings, the Court declined to consider whether the plaintiffs had pled falsity.

The plaintiffs also failed to state a claim under Section 20(a) because they had predicated their Section 20(a) claim entirely on their Section 14(a) and Section 10(b) claims, which had failed.

For these reasons, the Court dismissed the plaintiffs' claims.

## II.   Standards of Review

### A.  Rule 59(e) and Rule 15(a)

"[A] district court may not grant a post-judgment motion to amend the complaint unless the court first vacates its judgment pursuant to Fed. R. Civ. P. 59(e) or 60(b)." *Katyle v. Penn. Nat'l Gaming, Inc.*, 637 F.3d 462, 470 (4th Cir. 2011) (citing *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006) (en banc)). Under Rule 59(e), "[r]econsideration is an 'extraordinary remedy,' to be used 'sparingly,' available on only three grounds: 1) an intervening change in controlling law; 2) previously unavailable evidence; or 3) to correct a clear error of law or prevent manifest injustice." *JTH Tax, Inc. v. Aime*, 984 F.3d 284, 290 (4th Cir. 2021) (quoting *Pac. Ins. v. Am. Nat'l*

*Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998)). Nevertheless, when a party seeks both to vacate a judgment under Rule 59(e) and to amend its pleading, "the broad standard for allowing a court to grant the motion allows the court simply to turn to the standard applicable to the motion to amend." *Daulatzai v. Maryland*, 97 F.4th 166, 178–79 (4th Cir. 2024) (citing *Laber*, 438 F.3d at 427–28). Under that Rule 15(a) standard, a court considers whether amendment would cause prejudice to the opposing party or be futile and whether the movant acts in bad faith. *Id.* at 177 (citing *Katyle*, 637 F.3d at 471). If none of these is present, then the court should grant the motion. *See id.*; *see also* Fed. R. Civ. P. 15(a)(2). If the proposed amended complaint fails to state a claim, then amendment would be futile and the motion should be denied. *Katyle*, 637 F.3d at 471.

### B.  Rule 12(b)(6)

Amendment would be futile if the "proposed amended complaint does not properly state a claim under Rule 12(b)(6)." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008). Under Rule 12(b)(6), a party may seek dismissal for failure "to state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). To survive the challenge, the opposing party must have pled facts demonstrating it has a plausible right to relief from the Court. *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is more than merely conceivable or speculative. *See Holloway v. Md.*, 32 F.4th 293, 299 (4th Cir. 2022).

When ruling on a Rule 12(b)(6) motion, the Court must accept the allegations as true and draw all reasonable inferences in favor of the pleader. *Williams v. Kincaid*, 45 F.4th 759, 765, 777 (4th Cir. 2022). But the Court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39

F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)). Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista, Va.*, 917 F.3d 206, 212 (4th Cir. 2019)). The Court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

### C.  Rule 9(b)

When, as here, the allegations sound in fraud, the plaintiffs must meet the heightened pleading standard under Federal Rule of Civil Procedure 9(b). *In re Marriott Int'l, Inc. Cust. Data Sec. Breach. Litig.*, 543 F. Supp. 3d 96, 109 (D. Md. 2021) (requiring plaintiffs to satisfy Rule 9(b) for Section 10(b) claim); *Hershey v. MNC Fin., Inc.*, 774 F. Supp. 367, 375 n.9 (D. Md. 1991) (noting that "Rule 9(b) applies to § 14(a) claims when the underlying claim sounds in fraud"). Under Rule 9(b), the plaintiffs must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). These circumstances include "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 219 (4th Cir. 2015) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).

### D.  The Private Securities Litigation Reform Act

Under the PSLRA, the plaintiffs also must identify with precision any misleading statements or omitted material facts.[7] To do so, the plaintiffs must "specify each statement alleged

---

[7] The Supreme Court and the Fourth Circuit have not directly addressed whether plaintiffs alleging Section 14(a) claims must identify misstatements or omissions with the precision required by the PSLRA. But in cases in which the plaintiffs allege fraudulent conduct, courts generally conclude

to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). If a complaint fails to meet the PSLRA's requirements, it must be dismissed. *Id.* § 78u-4(b)(3)(A); *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 894 (4th Cir. 2014) (affirming dismissal of securities fraud class action complaint for, among other reasons, failure to meet the PSLRA's pleading requirements).

## III.   Discussion

The proposed second amended complaint still fails to state a claim under the three statutes the plaintiffs invoke. Even assuming without deciding that the plaintiffs have plausibly alleged facts sufficient to establish the reliability of the Scorpion Report and CW1, the plaintiffs have not pled loss causation for their Section 14(a) claim or their Section 10(b) claim. As before, the

---

they must. *See Burt v. Maasberg*, No. ELH-12-0464, 2013 WL 1314160, at *28 (D. Md. Mar. 31, 2013) (citing *Cal Pub. Empls. Ret. Sys. v. Chubb Corp.*, 395 F.3d 126, 144–45 (3d Cir. 2004)).

> [This] approach comports with the plain language of the PSLRA, which applies "in *any private action arising under this chapter* in which the plaintiff alleges that the defendant . . . made an untrue statement of a material fact; or . . . omitted to state a material fact necessarily in order to make the statements made . . . not misleading."

*Id.* (quoting 15 U.S.C. 78u-4(b)(1)) (emphasis in *Burt*). While the plaintiffs state that their Section 14(a) claim "does not sound in fraud," ECF 64, ¶ 265, they clarify in their opposition that they object to a requirement that they show fraudulent *intent* for their Section 14(a) claim. But they do not object to being held to the PSLRA and Rule 9(b) pleading requirements. Their cited cases support this approach. *See In re Willis Towers Watson PLC Proxy Litig.*, 439 F. Supp. 3d 704, 714 (E.D. Va. 2020) ("[A] plaintiff [asserting a Section 14(a) claim] must allege with specificity the alleged misrepresentation or omission and why those statements or omissions were false or misleading.").

insufficiency of their Section 14(a) claim and their Section 10(b) claim sinks their Section 20(a) claim as well. Accordingly, amendment would be futile.

### A. Section 14(a) claim

The purpose of the Exchange Act is to "ensure that companies disclose the information necessary for investors to make informed investment decisions." *Yates*, 744 F.3d at 884 (citation omitted). To accomplish this purpose, Section 14(a) of the Exchange Act prohibits the solicitation of "proxies through a proxy statement that contains false or misleading material facts or omits any material fact that leaves a proxy statement false or misleading." *Paradise Wire & Cable Defined Ben. Pension Plan v. Weil*, 918 F.3d 312, 318 (4th Cir. 2019) (citing 17 C.F.R. § 240.14a-9(a)). Section 14(a) carries an implied private right of action. *See Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1099 (1991). To state a claim under Section 14(a), a plaintiff must allege "that (1) the proxy statement contained a material misrepresentation or omission (2) that caused the plaintiff injury and that (3) the proxy solicitation was an essential link in the accomplishment of the transaction" that produced the injury. *Hayes v. Crown Cent. Petroleum Corp.*, 78 F. App'x 857, 861 (4th Cir. 2003) (*per curiam*) (citing *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992)).

To satisfy the second element of a Section 14(a) claim, loss causation, a plaintiff must plead "a sufficiently direct relationship between the plaintiff's economic loss and the defendant's fraudulent conduct." *Singer v. Reali*, 883 F.3d 425, 445 (4th Cir. 2018) (quotation omitted); *see also Karp v. First Conn. Bancorp, Inc.*, 69 F.4th 223, 235–36 (4th Cir. 2023) (holding that cases discussing loss causation in Section 10(b) context apply in Section 14(a) context). A plaintiff can plead a sufficiently direct relationship by "alleging facts establishing that the defendant's 'misrepresentation or omission was one substantial cause of the investment's decline in value.'"

*Singer*, 883 F.3d at 445 (quoting *Katyle*, 637 F.3d at 472). A plaintiff must plead "(1) the exposure of the defendant's misrepresentation or omission, i.e., the revelation of new facts suggesting the defendant perpetrated a fraud on the market, and (2) that such exposure resulted in the decline of the defendant's share price." *Id.* (internal quotations omitted).

The Fourth Circuit recognizes that exposure for purposes of loss causation can be alleged pursuant to a "corrective disclosure" theory or a "materialization of a concealed risk" theory. *Id.* at 445. A corrective disclosure theory posits that the defendant itself revealed that it had perpetrated a fraud on the market by making material misrepresentations or omissions. *Id.* A materialization of concealed risk theory contends that "news from another source revealed the company's fraud." *Id.* (citing *Katyle*, 637 F.3d at 477 n.10). Either way, the plaintiffs must allege that the company's statements "concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.* (citing *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261–62 (2d Cir. 2016) (emphasis omitted)). And either way, "the plaintiff must show that the loss caused by the alleged fraud results from the 'relevant truth . . . leak[ing] out.'" *Id.* (quoting *In re Vivendi*, 838 F.3d at 261).

As before, the plaintiffs attribute their losses to the Scorpion Report and the defendants' response to it. To be precise, the plaintiffs claim the "relevant truth"—that IonQ's 32-qubit computer did not exist and that its error correction was worse than stated—was first disclosed to the market in the Scorpion Report (which was published before the market opened on May 3, 2022) and that the Report's disclosures of those ostensible facts caused the price of IonQ's stock to drop that day by 9.03%, falling from $7.76 per share to $7.15 per share. But the plaintiffs acknowledge that the market erased most of those losses the next day, with the price per share rallying to $7.50. The plaintiffs attribute the second and larger portion of their injury—the

subsequent decline from $7.50 per share on May 4 to $4.34 per share on May 11—to the defendants' first public statement in response to the Scorpion Report, which conspicuously did not deny any of its specific claims. In the plaintiffs' view, the Scorpion Report—the materialization of a concealed risk—caused their first losses. And the defendants' May 4 press release, read in conjunction with the Scorpion Report, amounted to a corrective disclosure that caused their second losses.

The plaintiffs' first loss causation claim—the one that depends entirely on the Scorpion Report—turns on whether an anonymously sourced short-seller report that disclaims its own accuracy can satisfy the loss causation element. The Fourth Circuit has not addressed that question. The Ninth Circuit has twice answered no. *See In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828 (9th Cir. 2022); *Houston Mun. Emp. Pension Sys. v. BofI Holding, Inc.* (*In re BofI Holding, Inc. Sec. Litig.*), 977 F.3d 781 (9th Cir. 2020). In the most recent case, *In re Nektar*, the court considered whether an anonymous short-seller report that claimed the results of a pharmaceutical company's clinical trial were false could serve as a corrective disclosure that caused the company's stock prices to drop by 7%. 34 F.4th at 833–34, 839–40. *In re Nektar* first considered "whether the court can 'plausibly infer that the alleged corrective disclosure provided new information to the market that was not yet reflected in the company's stock price.'" *Id.* at 839 (quoting *In re BofI*, 977 F.3d at 795). It then found that the anonymous short-seller report likely did provide new information to the market—the report "pulled together disparate sources and connected data in ways that were not plainly obvious" and it "compared statements made by [the company] at different conferences and it cross-checked sources provided by [the company]." *Id.* at 840. Nevertheless, the court found that because the report was "authored by anonymous short-sellers who had a financial incentive to convince others to sell" and contained "disclaimers from the authors stating that they made 'no

representation as to the accuracy or completeness of the information set forth in [the report],'" it was "not plausible that the market would perceive the [report] as revealing false statements because the nature of the report means that investors would have taken its 'contents with a healthy grain of salt.'" *Id.* (quoting *In re BofI*, 977 F.3d at 797). The court held that the report could not establish loss causation. *Id.*

In its prior opinion, the Court concluded that the analysis in *In re Nektar* is persuasive, but only to a point. As a general matter, it is implausible that investors take reports with these indicia of unreliability at face value. However, even if investors typically take short-seller reports like these with a grain of salt, it does not follow that investors always disregard them entirely. The threshold question is "whether the market could have perceived [the allegation] as true." *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 696 (6th Cir. 2017). The answer to that question is context sensitive. Additional specific factual allegations might make it plausible that "the market treat[ed] [the report's] allegations . . . as sufficiently credible to be acted upon as truth, and the inflation in the stock price attributable to the defendant's misstatements [wa]s dissipated as a result." *In re BofI*, 977 F.3d at 792. What matters is whether the plaintiffs allege enough additional facts to turn the otherwise implausible claim that this sort of short-seller report exposed the truth to investors into a claim plausible enough to survive a motion to dismiss.

Following authorities like *In re Netkar*, the Court found that the plaintiffs had failed to plausibly allege that the Scorpion Report caused their initial losses. It was implausible that investors believed "the relevant truth" was leaked by an anonymous short-seller report that "cannot and does not provide any representations or warranties with respect to [its] accuracy," ECF 75-31, at 3; that warns information provided by former IonQ employees "may be outdated," *id.*; that relies almost exclusively on anonymous sources whose vague and ambiguous statements are not

corroborated by independent facts; and whose author "stands to realize significant gains in the event that" the price of IonQ's securities declines, *id.* In the absence of additional allegations indicating that investors believed the Report, the nature of the Report made it implausible that investors perceived it as revealing information that IonQ had concealed from the market.

The new allegations in the proposed second amended complaint do not change that result. Here are the four new paragraphs relevant to loss causation:

> Market watchers uniformly attributed the decline in the IonQ's share price to the Scorpion Report, particularly its revelation that IonQ's 32-qubit computer did not exist. For example, on May 3, 2022, the day the report was issued, Investor Place, an investment website, published an article entitled, *IONQ Stock Falls 10% Following Scorpion Capital Short Report*, which stated that, "IonQ (NYSE:IONQ) stock is down about 7% today after Scorpion Capital released an 183 page short report on the company" and "through interviews with industry experts and former employees, Scorpion believes the company's claims of a 32-qubit machine are a 'brazen hoax.'"

> That same day, the investment website, Seeking Alpha, published an article entitled, *IonQ drops after new short report from Scorpion Capital*, which reported that "IonQ Inc. (NYSE:IONQ) fell 6.7% after a new short report from Scorpion Capital that alleged the quantum computing company may be a 'hoax' [because] . . . IonQ claims of having a 32-qubit machine aren't real."

> Also on May 3, 2022, web-based business magazine, Business Insider, reported that "IonQ Inc (NYSE:IONQ) shares are trading lower Tuesday following a short report from Scorpion Capital" which alleged that "IonQ's quantum computer with world-leading power is a hoax."

> Similarly, on May 4, 2022, The Quantum Insider, "the leading provider of media and market intelligence on the quantum technology industry," published an article entitled, *TQI Exclusive: IonQ Stock Falls After Short Report From Scorpion Capital*, which stated that the Scorpion Report was "helping drive a 10% decline in the IONQ stock price" because the report revealed that "IonQ's much-touted latest iteration of its technology [read: its 32-qubit computer], essentially, did not exist."

ECF 101, ¶¶ 234–37 (alterations in proposed second amended complaint). None of these allegations "show[s] that the loss caused by the alleged fraud result[ed] from the 'relevant truth . . . leak[ing] out.'" *See Singer*, 883 F.3d at 445. The articles in the first three paragraphs do not

even attribute the initial decline in IonQ's stock price to the Scorpion Report. ECF 101, ¶¶ 234–36. Instead, each simply observes that the decline followed the publication of the Report. *Id.* Because correlation does not imply causation, courts have declined to find that articles like these show loss causation. *See Bajjuri v. Raytheon Techs. Corp.*, No. CV-20-00468-TUC-JCH, 2023 WL 3650554, at *16 (D. Ariz. May 25, 2023) (finding that similar articles did not show loss causation because they "imply a connection between the drop and the disclosure" without analyzing or articulating the nature of that connection).

More importantly, none of the articles the plaintiffs cite in the proposed second amended complaint endorses the Scorpion Report's claims as true or even attributes the drop in share price to investors' beliefs that the claims were true.[8] In fact, only one of the articles—the *Quantum Insider* article—even addresses the merits of the Scorpion Report's claims at all. *See* ECF 75-35, at 3–4. And that article casts serious doubt on the Report's accuracy and import. *See id.* The *Quantum Insider* article cautions readers that the Scorpion Report presents a "limited" set of expert perspectives unrepresentative of views in the field as a whole. *Id.* at 3. It warns that the tests the anonymous experts ran to evaluate IonQ's systems were "not [] particularly helpful" because they

---

[8] To determine whether a complaint states a claim, courts may consider the complaint's allegations, documents attached to the complaint, and "such sources outside the complaint that are, in effect, deemed to be part of the complaint, for example, documents incorporated into the complaint by reference and matters of which a court may take judicial notice." *In re Under Armour Sec. Litig.*, 342 F. Supp. 3d 658, 666–67 (D. Md. 2018) (discussing Rule 12(b)(6)) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)); *see* Fed. R. Civ. P. 10(c). A document is incorporated into the complaint by reference if it is "integral to and explicitly relied on in the complaint" and if the plaintiffs do not challenge its authenticity. *In re Under Armour Sec. Litig.*, 342 F. Supp. 3d at 606 (citations omitted); *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 625 (4th Cir. 2008) (considering investment analyst reports attached to the motion to dismiss because the complaint quoted from the reports and the plaintiffs did not challenge the reports' authenticity). The Court considers the entirety of the four articles the plaintiffs cite and quote because they are integral to and explicitly relied on in the complaint and the plaintiffs do not challenge their authenticity.

involved operations outside the "core competency" of quantum computers. *Id.* And the article does not endorse any of the Report's claims as true or report that investors believed them. *See id.* at 3– 4.

Here is the upshot. The plaintiffs needed to allege facts indicating that investors took the Report's claims as true and IonQ's share price declined for that reason. Instead, the plaintiffs have alleged facts indicating, at most, that the publication of the Report was one cause of the price dip that followed. Even when the Court draws every inference in the plaintiffs' favor, they still have not plausibly alleged that the stock price declined because the market perceived the Report's claims as accurate revelations of misrepresentations by IonQ. So the plaintiffs still have not pled their first loss causation claim. *See Norfolk Cnty.*, 877 F.3d at 696.

In a footnote on the last page of their reply brief, the plaintiffs cite two cases that they claim show that their allegations about the Scorpion Report and its reception suffice to plead loss causation. Neither does. In *Garcia v. J2 Global, Inc.*, No. 2:20-cv-06096-FLA (MAAx), 2021 WL 1558331 (C.D. Cal. Mar. 5, 2021), the court held that the plaintiffs in a securities class action had pled loss causation by alleging that two research firms published articles exposing misrepresentations by the defendant, driving the price of the defendant's stock down. *Id.* at *4, 20–22. Like Scorpion, one of the firms was in the short-selling business. *See id.* at *4. But the similarities end there. The *Garcia* reports had far fewer credibility problems than the Scorpion Report. Whereas the Scorpion Report disclaims its own accuracy, the *Garcia* research reports assured readers of the truth of their claims: One informed readers that the organization was "confident in [its] conclusions," while the other insisted that "[t]o the best of our ability and belief, all information contained herein is accurate and reliable." *See id.* at *22. Whereas the Scorpion Report relies on anonymous, vaguely identified sources for its most explosive claims, the reports

in *Garcia* did not appear to rely on anonymous sources at all. *See id.* In fact, the *Garcia* reports exposed the defendant's misrepresentations by analyzing publicly available information. *Id.* Because the *Garcia* reports stood by their claims, relied solely on publicly available information, and confirmed one another, it was plausible that investors believed they had revealed new, accurate information and sold their shares accordingly. *See id.* Because the Scorpion Report disclaimed the truth of its own claims, relied significantly on anonymous sources it did not describe in detail, and contained multiple additional indicia of unreliability, the plaintiffs here must allege more to make it plausible that investors believed the Scorpion Report than the plaintiffs in *Garcia* had to allege to make it plausible that investors believed in the two reports at issue there. But they have not.

The plaintiffs' reliance on *Behrendsen v. Yangtze River Port & Logistics Ltd.*, 19-cv-00024 (DLI)(LB), 2021 WL 2646353 (E.D.N.Y. June 28, 2021) runs into a similar problem. There, too, the court held that securities class action plaintiffs had pled loss causation by alleging a short-seller report exposed new truths about the defendant that contradicted what the defendant had assured investors. *See id.* at *2, *14–16. That short-seller report, like the Scorpion Report, relied in part on anonymous sources. *See id.* at *15. But the report at issue in *Behrendsen* had substantial indicia of reliability the Scorpion Report lacks. Two of its three revelations rested entirely on Chinese court records, rather than on anonymous sources. *Id.* at *15. And although the third finding rested on conversations with unnamed sources, the report identified them with enough detail to make it plausible they knew what they were talking about: The defendant had told investors it had leased land from the government of a particular village; officials of that village told the authors of the report that the defendant had not, in fact, leased any land from them. *Id.* What's more, the *Behrendsen* Court did not identify any of the other indicia of unreliability that plague the Scorpion

Report. *See id.* at *14–16. So the allegations in *Behrendsen* made it far more plausible that investors believed the report than the allegations here.[9]

In their brief in opposition to the defendants' notice of supplemental authority, the plaintiffs point to one more case where a court found securities class action plaintiffs had pled loss causation with allegations that a short-seller report exposed the truth about a company's fraud. *See* ECF 109, at 3–5 (citing *Saskatchewan Healthcare Employee's Pen. Plan v. KE Holdings Inc.*, 1:21-cv-11196-GHW, 2024 WL 775195 (S.D.N.Y. Feb. 26, 2024)). The plaintiffs in *KE Holdings* alleged that the defendant, the largest real estate brokerage in China, had exaggerated the number of agents and stores that used its online platform. *Id.* at *1. That truth came to light, they claimed, when a short seller published a report revealing massive discrepancies between what the defendant told investors and what its own investigation revealed. *Id.* at *4. The court held that the plaintiffs had pled loss causation. *Id.* at *32–33.

However, the court's reasoning has little persuasive value for this case. First, the loss causation analysis in *KE Holdings* does not even consider the key question here: what securities

---

[9] The plaintiffs claim that the "reports in *Behrendsen* and *Garcia* were found sufficient to allege loss causation even though they expressly disclaimed their accuracy or completeness . . . Indeed, **all** such short reports contain these disclaimers." ECF 107, at 21 n.14. As the plaintiffs say, the report in *Behrendsen* and one of the reports in *Garcia*, both issued by Hindenburg Research, have similar disclaimers that they "make[] no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information." *See Behrendsen*, No. 19-0024 (DLI)(LB) (E.D.N.Y.), ECF 12-1, at 19; *Garcia*, No. 20-6096-FLA-MAA (C.D. Cal.), ECF 43-20, at 41. But neither court discussed these disclaimers, so it is not clear what weight, if any, these courts gave them. To the extent these courts noticed and considered these disclaimers at all, they appear to have discounted them because the reports also included assurances that "[t]o the best of our ability and belief, all information contained herein is accurate and reliable." *See Behrendsen*, No. 19-0024 (DLI)(LB) (E.D.N.Y.), ECF 12-1, at 19; *Garcia*, No. 20-6096-FLA-MAA (C.D. Cal.), ECF 43-20, at 41; *see also Garcia*, 2021 WL 1558331, at *22 (taking this assurance seriously). The Scorpion Report offers no such assurances. And as this Court has explained in the preceding paragraphs, the Scorpion Report has additional indicia of unreliability—like anonymous sourcing, vague claims, and the absence of corroborating sources—with no correlates in the *Behrendsen* and *Garcia* reports.

class action plaintiffs must plead to show that investors believed a source with significant indicia of unreliability exposed the truth about the defendant. *See id.* Second, the loss causation analysis in *KE Holdings* turned on law with no analogue in the Fourth Circuit. *KE Holdings* began by observing that in the Second Circuit, the burden of pleading loss causation is "not a heavy one" because the plaintiff may satisfy it by alleging merely that the defendant's stock price declined on the same day the alleged revelations emerged. *See id.* at \*32–33 (quoting *DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 212 (S.D.N.Y. 2019), and citing *In re VimpelCom, Ltd.*, No.1-15-CV-8672 (ALC), 2016 WL 5390902, at \*3 (S.D.N.Y. Sept. 26, 2016)). By contrast, in the Fourth Circuit, the "ultimate loss causation inquiry" is whether "the loss caused by the alleged fraud results from the 'relevant truth . . . leak[ing] out.'" *Singer*, 883 F.3d at 446 (quoting *In re Vivendi*, 838 F.3d at 261). In consequence, loss causation analysis in this circuit requires consideration of whether the plaintiffs have plausibly alleged that the market perceived the ostensible revelations as the truth. *See id.* at 446–47. In some cases, it may be easy for plaintiffs to bear that burden; but at least where the revelations at issue come from a dubious source, it is not. Third, even setting that legal distinction aside, the report at issue in *KE Holdings* lacked the Scorpion Report's significant indicia of unreliability that make it less plausible that investors believed the Report revealed fraud by IonQ. The report in *KE Holdings* carefully analyzed data the defendant itself had published; included a lengthy description of its methodology; corroborated its claims with contemporary photographs; spoke directly with current employees of the defendant; and described its findings with mathematical precision. *KE Holdings*, 2024 WL 775195, at \*4–7. Nowhere, it seems, did the report disclaim its own accuracy or timeliness. *See id.* True, like the Scorpion Report, the report in *KE Holdings* came from an avowed short seller. *See id.* at 4. But the report's authors explained why they were selling the defendant's

stock short: "because we conclude that the Company is engaged in systemic fraud." *Id.* All told, *KE Holdings* does not persuade the Court that the plaintiffs have pled loss causation in their proposed second amended complaint.

Despite the deficiencies with their short-seller cases, the plaintiffs claim that it is enough that they have alleged that IonQ's share price declined after the publication of the Scorpion Report and that the *Quantum Insider* article linked the former to the latter. But the three further cases the plaintiffs cite for their position involve substantially different facts. None even considered what a plaintiff must allege to make it plausible that investors believed an otherwise dubious source.

*In re CenturyLink Sales Practices & Securities Litigation*, 403 F. Supp. 3d 712 (D. Minn. 2019), concerned a telecommunications provider, CenturyLink, that had illegally overbilled its customers. *Id.* at 721. CenturyLink repeatedly assured its investors that it did not engage in a suite of deceptive billing practices; in fact, the company secretly depended on them. *Id.* at 720–22. When a CenturyLink employee objected to the practices, the company fired her. *Id.* at 722. A few months later, Bloomberg reported on the employee's allegations about the company and her firing. *Id.* That same day, CenturyLink's stock price fell 5%. *Id.* A few days later, Bloomberg reported on a consumer class action lawsuit against CenturyLink over the scheme—driving the stock price down again. *Id.* The following month, several news outlets reported that the Minnesota Attorney General had conducted a year-long investigation into CenturyLink's overbilling and decided to sue the company. *Id.* The share price fell yet again. *Id.* Analysts attributed these declines in the share price to the "revelations" in these news articles. *Id.* at 736. In a subsequent securities class action against CenturyLink, the U.S. District Court for the District of Minnesota held that the plaintiffs had pled loss causation because these factual allegations "indicat[ed] that the market perceived the allegations [in the news reports] to be true." *Id.* at 735–36.

According to the plaintiffs here, the lesson of *CenturyLink* is simple: "[R]eports or articles describing investor reactions to corrective disclosures or materializations of undisclosed risks support allegations that investors considered a disclosure reliable." ECF 107, at 20. That is true as far as it goes. But the case at hand poses a different and more difficult question than *CenturyLink*: what plaintiffs must allege to make it plausible that investors believed an anonymously sourced short-seller report that disclaimed its own accuracy. True, the Scorpion Report and the *CenturyLink* lawsuits alike rested on unproven allegations. But none of the news reports and lawsuits that triggered the selloffs in *CenturyLink* had the indicia of unreliability that permeate the Scorpion Report. Whereas the Scorpion Report relied on anonymous sources, the lawsuits relied on some combination of the word of a named whistleblower, a formal investigation by the Minnesota Attorney General, and news reports. Whereas the Scorpion Report disclaimed its own accuracy, the whistleblower and the Minnesota Attorney General took real risks to stand by their claims— with the former losing her job and the latter assuming the responsibility of proving its case in court. And whereas Scorpion was in the business of publishing damning reports about companies and then shorting their stocks, the whistleblower and the Minnesota Attorney General's office had no personal financial interest in discrediting CenturyLink. It should be no wonder that plaintiffs must allege more to make it plausible that investors believed an anonymously sourced, accuracy-disclaiming short-seller report than they must allege to make it plausible that investors believed the mutually corroborating accounts of a named whistleblower, a state attorney general's office, and multiple news organizations. And it bears repeating that the plaintiffs here do not allege that any analyst endorsed the Scorpion Report as true, or even reported that investors believed the Scorpion Report was true.

The next case the plaintiffs cite is *Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST, 2018 WL 1070116 (N.D. Cal. Feb. 27, 2018). There, Wells Fargo shareholders brought a securities class action against the bank for misrepresenting the sources of its profits. *Id.* at *1–2. Wells Fargo attributed its success to its "cross-selling" business model, which encouraged employees to sell multiple banking products to each Wells Fargo customer. *Id.* at *2. In fact, Wells Fargo was thriving because the company encouraged its employees to sign customers up for new credit cards and bank accounts without the customers' consent. *Id.* In September 2016, four events brought the truth to light. *Id.* at *2, *11. Wells Fargo reached settlements with various government entities for the hitherto undisclosed fraud and agreed to pay fines for its wrongdoing. *Id.* at *11. Wells Fargo announced that it would stop incentivizing its employees to create fake accounts. *Id.* News organizations reported that the U.S. Department of Justice subpoenaed Wells Fargo for information about the scheme. *Id.* And then a Wells Fargo executive and the Director of the Consumer Financial Protection Bureau testified about the scandal before Congress. *Id.* When all was said and done, the price of shares in Wells Fargo fell to a two-and-a-half-year low. *Id.* at *2. Reuters and CNN attributed the drop to the disclosure of the scandal and the associated government action against Wells Fargo. *Id.* In a single paragraph of analysis, the district court concluded that the plaintiffs had pled loss causation. *Id.* at *11.

*Hefler* is no more useful to the plaintiffs than *CenturyLink*. *Hefler* did not involve a short-seller report at all, much less an anonymously sourced one that disclaims its own accuracy. And *Hefler* involved sources with no significant indicia of unreliability, if any. In *Hefler*, the truth emerged through a corrective disclosure by Wells Fargo itself, the public testimony of one of Wells Fargo's own executives, the conduct of multiple government agencies and their officers, and reporting by credible news outlets. *Id.* at *2, *11. There is no comparison between the *Hefler*

plaintiffs' allegations that investors believed four independent, mutually reinforcing revelations—including from the defendants themselves—and the plaintiffs' allegations here that investors accepted the truth of an uncorroborated short-seller report brimming with disclaimers and caveats. *Hefler* is no help to the plaintiffs.

Last, the plaintiffs read *Lloyd v. CVB Financial Corporation*, 811 F.3d 1200 (9th Cir. 2016), for the proposition that a "steep stock price decline" and the "attribution of [that decline by] bloggers and analysts to disclosure" is enough to "support loss causation." ECF 107, at 21 (citing *Lloyd* 811 F.3d at 1210). But *Lloyd* did not so hold, and even if it did, its facts were plainly distinguishable. In *Lloyd*, a commercial lender twice represented in SEC filings that it had no "serious doubt" about its largest borrower's ability to repay its loans, even though—unbeknownst to the public—the borrower had twice informed the lender that it could not repay the loans. *Id.* at 1202. When the lender announced that it had received a subpoena from the SEC and analysts linked the subpoena to the struggling borrower, the lender's stock price tumbled over 20 percent. *Id.* at 1202, 1204–05. A month later, the lender announced that it would have to write down its loans to the struggling borrower, *id.* at 1202—effectively confirming the lender had misled its investors—but curiously, "the market reacted hardly at all" to that "bombshell disclosure," *id.* at 1210. After shareholders brought a securities class action, the district court held that the plaintiffs had failed to plead loss causation because the only significant drop in the stock price came after the defendant announced the subpoena, rather than after the subsequent corrective disclosure that the borrower could not repay the loans. *Id.* And under the law of that circuit, announcing an investigation could not, without more, count as a corrective disclosure. *Id.* The Ninth Circuit reversed, holding that the plaintiffs had pled loss causation. *Id.* On the Ninth Circuit's account, the fact that the defendant lender's stock price barely budged after the defendant admitted it would

have to write down the loans implied that investors had already "understood the [subpoena] announcement as at least a partial disclosure of the inaccuracy of the previous 'no serious doubts' statements." *Id.* In that context, the plaintiffs had plausibly alleged that the stock declined sharply after the subpoena announcement because investors believed the announcement was an admission that the defendant lender had misled them. *Id.*

Contra what the plaintiffs in this case claim, *Lloyd* did not hold that the plaintiffs there had pled loss causation simply because they had alleged that the defendant's stock price declined after the subpoena announcement and that analysts attributed that decline to the announcement. To the contrary: *Lloyd* held that the plaintiffs had pled loss causation only because they had further alleged facts about shareholders' subsequent behavior that revealed investors believed the subpoena announcement meant the defendant had deceived them. *See id.* Here, the plaintiffs have not alleged any analogous facts indicating investors believed the Scorpion Report revealed the truth about IonQ's technology and revenue sources. They have alleged facts indicating only that the stock price briefly declined after the publication of the Report.

If anything, *Lloyd* undermines the plaintiffs' first theory of loss causation. Contrast the price trajectories of the stocks at issue. In *Lloyd*, the defendant's stock price declined precipitously after the defendant announced the subpoena, but then declined only slightly after the defendant admitted the borrower could not repay the loans. *Id.* The Ninth Circuit found that this sequence (sharp decline and then slight decline) made it reasonable to infer that investors believed the first announcement implicitly revealed what the second explicitly spelled out. *Id.* This price trajectory suggested that by the time the defendant lender admitted to the misrepresentations, that revelation was baked into the share price. *Id.* Here, by contrast, IonQ's stock price declined after the release of the Scorpion Report, but then largely recovered. IonQ's shares declined much more significantly

after IonQ issued its first statement about the Report, which did not deny the Report's specific allegations. By *Lloyd*'s logic, that sequence (slight, temporary decline and then sharp, enduring decline) suggests that investors did not believe the Scorpion Report alone revealed the truth about IonQ—at least, not until IonQ's response implicitly leant the Report credence by failing to thoroughly dispute it. If investors had sold off IonQ shares because they took the Scorpion Report at its word, IonQ's subsequent statement would not have driven a significant further sell-off. In this way, too, *Lloyd* is no help to the plaintiffs' first theory of loss causation: that investors believed the Scorpion Report revealed the truth about IonQ and sold their shares accordingly.

The plaintiffs' new allegations also do nothing to salvage their second loss causation claim: that the defendants' May 4 press release, read in conjunction with the Scorpion Report, was a corrective disclosure of the truth of the report's allegations. As the Court observed in its prior opinion, that loss causation claim depends on a series of legal premises: i) that a plaintiff may plead loss causation by the combination of the materialization of a concealed risk and a corrective disclosure; ii) that a statement may count as a corrective disclosure even when it does not expressly correct any specific falsehood; and iii) that a statement may count as a corrective disclosure solely by virtue of its failure to deny a third-party's public allegation of a specific falsehood—that in the right context, an omission is an admission. As the Court explained then, there is no authority for the third premise in the Fourth Circuit or elsewhere. In the latest round of briefing, the plaintiffs still have not identified any authority for that third premise. Nor have they bolstered this claim in some other way with new factual allegations. So it fails again for the same reasons.

The plaintiffs still have not pled loss causation. Accordingly, they have failed to state a claim under Section 14(a). Amendment would be futile.

### B.  Section 10(b) claim

Section 10(b) of the Exchange Act prohibits the use of "any manipulative or deceptive device or contrivance" in connection with the sale of a security in violation of SEC rules. *Yates*, 744 F.3d at 884 (citing 15 U.S.C. § 78j(b)). Rule 10b-5, which implements Section 10(b), makes it unlawful, in connection with the sale of a security:

    (a) To employ any device, scheme, or artifice to defraud,

    (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

    (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5. Section 10(b) "provides an implied right of action for purchasers or sellers of securities who have been injured by violations of the statute." *Yates*, 744 F.3d at 884 (citing *Stoneridge Inv. Partners v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Singer*, 883 F.3d at 437 (quoting *Stoneridge*, 552 U.S. at 157).

The plaintiffs again allege that, starting with the announcement of the merger agreement between IonQ and dMY on March 8, 2021, the defendants made materially misleading statements with the requisite scienter, leading the investing public to believe that IonQ had made certain breakthroughs in its quantum computing systems when it had not and that it had tripled contract bookings as a result of new cloud-based customers, rather than a related third-party. Now, as before, the defendants challenge the pleading sufficiency of three of Section 10(b)'s six elements.

They argue the plaintiffs have not adequately alleged that they made material misrepresentations or omissions with the requisite scienter and have not adequately pled loss causation.

For the same reasons that the plaintiffs still fail to adequately plead loss causation for their Section 14(a) claim, they still fail to do so for their Section 10(b) claim. The problem remains that the plaintiffs have not plausibly alleged that investors took the Scorpion claims as the truth despite the organization's avowedly self-interested motives and the Report's anonymous sources, vague claims, and disclaimers of accuracy. Accordingly, amendment would be futile. The Court need not, and does not, decide more.

### C.  Section 20(a) claim

In the third count of the proposed second amended complaint, the plaintiffs allege secondary liability under Exchange Act Section 20(a) against the individual IonQ defendants, Chapman and Kramer. Under Section 20(a),

> Every person who directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Thus, "the liability of a control person under section 20(a) is derivative of—and dependent upon—liability of a controlled person under Section 10(b)." *Singer*, 883 F.3d at 438; *In re Under Armour Sec. Lit.*, 540 F. Supp. 3d 513, 523 (D. Md. 2021) (noting that a Section 20(a) claim for controlling person liability must allege a predicate violation of Section 10(b)). Section 20(a) confers a private right of action on buyers and sellers of securities who trade "contemporaneously" with an insider in possession of material nonpublic information. *See* 15 U.S.C. § 78t-1(a).

The lead plaintiffs "predicate their § 20(a) claims only on their § 10(b) and § 14(a) claims." *Syneos Health*, 2023 WL 4688178, at *8 n.11. Because both of those claims fail, "so too do [their] § 20(a) claims." *Id.* (affirming dismissal of Section 20(a) claims where Section 10(b) and 14(a) claims were dismissed); *KBC Asset Mgmt.*, 19 F.4th at 608 (affirming dismissal because failure of Section 10(b) claim "dooms their [Section] 20(a) claim"). Amendment would be futile.

## IV.     Conclusion

For the foregoing reasons, the plaintiffs' motion for reconsideration and leave to file an amended complaint is denied. A separate order follows.


July 10, 2024
Date

Deborah L. Boardman
United States District Judge